In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-23-00177-CR**

**WILLIAM MATTHEW PERMENTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F21-37529**

**MEMORANDUM OPINION**

A jury convicted William Matthew Permenter of the first-degree felony offense of continuous sexual abuse of a young child, K.P. ("Kate"), and he was sentenced to twenty-five years of incarceration.[1] Permenter appeals, and in two issues asks whether: (1) the trial court erred by allowing his video statement into

---

[1]To protect the privacy of the minor victim, we refer to her by a pseudonym and family members by their relationship to the victim. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

evidence in violation of Texas Code of Criminal Procedure article 38.22 section 3(a) because police failed to give him a *Miranda* warning; and (2) there was sufficient evidence to support the conviction. We affirm the trial court's judgment for the reasons discussed below.

## BACKGROUND AND TRIAL EVIDENCE

### The Indictment

A Jefferson County grand jury indicted Permenter, alleging that

during a period that was thirty (30) or more days in duration, to-wit: from on or about the 17TH day of FEBRUARY, TWO THOUSAND AND NINETEEN, through on or about the 31ST day of MARCH, TWO THOUSAND AND TWENTY, and anterior to the presentment of this indictment, when the Defendant was 17 years of age or older, commit two or more acts of sexual abuse against [KATE], a child younger than 14 years of age and hereafter styled the Complainant, namely, Indecency with a Child under Texas Penal Code Section 21.11, and Aggravated Sexual Assault under Texas Penal Code Section 22.021, namely:

The Defendant did then and there, with the intent to arouse or gratify the sexual desire of any person, engage in sexual contact with the Complainant by touching the Complainant's genitals,

The Defendant did then and there, intentionally or knowingly cause the mouth of the Defendant to contact the sexual organ of the Complainant,

The Defendant, did then and there, intentionally or knowingly cause the sexual organ of the Defendant to contact the sexual organ of the Complainant, and

The Defendant, did then and there, intentionally or knowingly cause the sexual organ of the Defendant to penetrate the sexual organ of the Complainant.

2

**Testimony of A.G. ("Allie")[2]**

Allie, Kate's friend, testified at trial. They became friends through their home school cooperative when they were in middle school. Allie explained that although they knew each other, they did not become close friends until 2020, during the Covid pandemic.

Allie testified that she became concerned about Kate in the summer of 2020. She explained this was because Kate had a lot of anxiety and had a "really bad trigger where if you touched her knees, she would absolutely freak out and shut down[.]" After observing this behavior, Allie began asking Kate about it, but she did not want to talk about it. Allie found Kate's behavior alarming, and she often asked Kate about it, but Kate never explained why she was suddenly so reactive when someone touched her.

Allie was concerned for Kate. Allie noted that when Kate experienced these bouts of anxiety, she would often isolate, even when at Kate's house. She explained that Kate's anxiety was not constant, but it progressively became worse and debilitating to the point where Kate did not want to get out of the house or talk to anyone. There were times that they would be on the phone all night. Initially, Kate did not tell her why she would do these things, only that she was scared and wanted to be alone.

---

[2]We use pseudonyms to refer to witnesses unaffiliated with law enforcement.

Allie said that Kate also had trouble sleeping and had nightmares. Allie said that Kate's nightmares progressed, but she hid them initially; it was important to Kate that other people not know what was happening with her. Allie described that Kate would be distressed during these nightmares and cry out in her sleep, "No, stop it[.]" She also heard Kate say, "Please stop, Matt." Allie testified that the nightmares indicated something was wrong, but at the time, she did not know what was going on with Kate. Although Allie asked Kate about it, Kate "would never really want to talk about anything." When Allie heard Kate scream Permenter's name in a nightmare, that was the first time she had reason to believe he was involved in what was happening to Kate.

Allie testified that Kate began staying at her house often. Allie's mother had a rule that they were not allowed to have sleepovers unless the people were from out of town, but an exception was made for Kate, although Allie could not recall exactly when they had that conversation. During the summer of 2020, Kate stayed at their house three to four days a week. Allie eventually became concerned that Kate wanted to stay at her house, because Kate did not feel safe in her own home. It appeared to Allie that Kate did not want to sleep in her own home. In the summer of 2020, Kate's house was in Groves, Texas. Based on her observations, Allie became concerned that Kate was being sexually abused in her home by Permenter, who was her cousin.

4

The first time Kate was willing to talk about it was during a vacation with Allie's family in June 2020. Allie testified that Kate volunteered information and acted like she wanted to talk about it but would get halfway through a sentence, then Allie would have to ask a question to get Kate to finish the sentence. Allie said it seemed that Kate wanted to disclose the information but also still found it difficult to talk about. Allie explained that as Kate "got closer to actually telling me things that she would get more and more distressed, and her breathing would get really heavy, and she would start shaking." Initially, Kate did not provide any details, she just said something happened. Allie confronted Kate and told her she would listen; Kate would answer some questions but not others. Allie began "piecing things together" and determined that Kate was talking about being sexually abused, yet it was still difficult to get Kate to talk about anything.

It was clear to Allie that Kate wanted to keep it a secret, and Allie wanted to protect her privacy since she "didn't really know what was going on." In July and August 2020, Allie regularly urged Kate to report it. Allie testified, "I kept it a secret until I had her permission to not keep it a secret[,]" which occurred sometime in August 2020. Allie told her parents, which was a very emotional conversation, but she was confident her parents would know what to do. Allie's parents were shocked when she told them. Allie knew that her parents talked to Kate's mother and "that the police were called at some point."

5

Allie testified that there was instability in Kate's home given her parents' divorce. Allie also said that there was another suspected abuser of Kate, but Allie did not know specifics.

**Testimony of Angela Dillahunty**

Angela Dillahunty is the coordinator of the forensic nursing program at St. Elizabeth Hospital. Dillahunty is a registered nurse and has been working with Christus since 1982, and she has specialized in forensic nursing since 1995. She performs medical forensic examinations on adults and children and oversees other staff who work in the forensic department.

During Dillahunty's testimony, she discussed a report of Kate's forensic examination prepared by Rachel Thomas, another forensic nurse on staff who performed the examination. Dillahunty also described the difference between an acute forensic exam and a nonacute forensic exam. She explained that after five days, there would not be forensic evidence like DNA left on the body. Dillahunty told the jury the purpose of a sexual assault exam and what the nurses looked for. While she did not perform Kate's exam, Dillahunty testified that she reviews all charts within a couple of days of the exam, so she saw all the documentation shortly after Thomas prepared it.

**Testimony of C.G. ("Chelsea")**

Chelsea is Allie's mother. Chelsea's daughters, including Allie, are friends with Kate, whom they met through home school. Allie and Kate spent a lot of time together in the summer of 2020. Chelsea described Kate as "very silly" who "doesn't get serious very often[,]" but they saw at the time that "she would have anxiety, extreme panic attacks; and she would be a completely different personality." Chelsea said that when this happened, Kate would go into the bathroom or isolate. She recalled this happening in 2020 and maybe as far back as 2019. She also knew that Kate did not sleep well, and her daughters talked to her on the phone late into the night.

Chelsea testified that they normally did not allow sleepovers in their home, but during COVID, Allie came to them and asked that the rule be relaxed, because she was concerned for Kate. Allie made a "pretty strong appeal," and they were "okay with it." In the beginning, Allie did not give additional information about allowing Kate to stay with them, except that Allie said she needed a safe place to be. Chelsea inferred from this that Kate might not have a safe home environment. She testified that Kate was "there all the time." Chelsea remembered touching Kate's knees and her becoming very upset. She also remembered their beach vacation in June where Kate retreated "and didn't want to be with anybody and . . . was crying and very upset." Chelsea was alarmed but tried to give Kate space.

7

Chelsea knew Permenter, because Kate played on their volleyball team, and he came to some games. Her husband also hired Permenter to do some air conditioning repair work at his office.

Early in 2020, Allie came to them and said she did not think Kate was safe but was unsure what was going on. Allie returned to them in August 2020 and was very emotional and told them that Kate needed help. Her husband is a medical doctor and had to report it to Child Protective Services ("CPS"). So, they also told Mother what they knew and that they must report it. Chelsea and her husband went to Mother's home on a Wednesday afternoon and told her they knew that Kate was "being mishandled." She said that Mother was "very upset" and did not appear to know anything about this. Chelsea's husband told Mother that he must report it to CPS, and he did so the next day; Mother called the police after they left. Later that Wednesday night, a detective called and talked to Allie, and they went to the police station the next day.

**Testimony of S.P. ("Mother")**

Mother testified that Kate is her daughter. Mother testified that Kate was sixteen during trial, and she was born in 2006. Mother explained that she and Kate's father have been separated for eight years but are not legally divorced. Mother described Kate as "outgoing, bubbly, [and] always up for any new adventure[,]" and

8

always did well in school. Mother said she had known Allie and her family for about ten years.

Mother explained that the only dog they have that is not kenneled at night sleeps with Kate. She also testified that there was a time that Kate stayed with Allie often.

Mother explained that Permenter's first name is William, but he goes by Matthew, and he is Mother's first cousin. Mother and Permenter reconnected after his divorce and during her separation. Mother and Permenter moved in together for financial reasons. She explained that about six or seven months before Hurricane Harvey, which hit in August 2017, she began planning to move into her own place and that she and Permenter moved in together for cost sharing purposes. Mother, Permenter, and Mother's two children lived in the same house; they moved in together about a month before the hurricane hit.

The first home they moved into was in Bridge City. That home had three bedrooms. The children each had their own room, and Mother and Permenter had separate beds but shared a larger room. Mother and Permenter lived in the Bridge City house for about two years and moved around until December 2019. They then moved to Groves with the kids. That home also had three bedrooms, with each child having their own room, and Mother and Permenter sharing a larger room.

While they lived together, Mother observed Permenter's drinking "progressively get worse." Eventually, Mother said something to him about it "getting excessive" when he became belligerent and did not remember the next day; it began affecting her and the children. Mother described an incident where she caught Permenter walking around the house naked, but he did not remember.

Mother said that Permenter and Kate seemed to have a good relationship, and he took on a parental role with Kate. Mother explained that Kate's dad was very good financially, "but a lot of times he was kind of absent." Permenter was involved in the kids' lives and disciplined them if they were doing something wrong. Mother testified that she set the rules, but Permenter helped her enforce them with the kids. Mother did not like it when Permenter drank, then tried to discipline the children, because he could not think clearly. So, she told him he could not handle those things when he was drunk. Mother explained that when she and Kate disagreed, Permenter tried to mediate. Permenter fell into that role naturally, and many times, it felt like he was in charge. Permenter showed favoritism to Kate and volunteered for opportunities where he was alone with Kate.

When they moved into the Groves house, Permenter's drinking escalated, and Kate stayed at Allie's more. Mother testified that Kate began staying at Allie's more before COVID. She noticed that Kate was spending "excessive" time with Allie's family, but she trusted them and knew Kate was safe. At the time, Mother did not

10

believe that Kate was staying there because she did not feel safe inside their home. Looking back, Mother felt she should have questioned it more.

Mother discussed the incident that occurred in the Groves house where she found Permenter walking around naked. She said that she asked him what he was doing and told him to go get in bed. He responded, "I can't get in bed because the dog's in the way." Mother explained that she spoke to Permenter the next day about it, which was also the day that Allie's parents came to the house and told her something happened, so she did not "have time to even process it[.]" Mother explained that it "shook" her, because Kate was the only person in the house who had a dog sleeping with them, and Permenter told Mother he could not go to bed because the dog is in the way and he was naked when he said it. Permenter was drunk when this happened. Mother explained that when Kate was not home, Kate's dog slept in a kennel. Mother noticed that Kate began having problems with anxiety but could not say when it started.

Kate spent the night with the Allie's family the night before her parents told Mother what was happening, and her parents dropped Kate off at volleyball before they came over. When they told Mother, Allie's parents offered to let Kate stay with them for a while, but she relayed that was unnecessary, because Kate would never see him again. Mother's son then packed some things for himself and Kate so they could leave. Permenter was not home at the time. Mother then

11

picked Kate up from volleyball and told her she knew what happened. When Mother told Kate that she knew, Kate "just kind of teared up, and she didn't really say a lot." Mother believed Kate "was just glad that it was over."

Mother called Permenter and told him she knew what he did, that she never wanted to see him again, and that she needed a safe time to get her stuff, because she was leaving. Permenter responded that he would be out of the house in thirty minutes, and Mother and the kids could return to the house. Later that night, Permenter texted Mother and said he was gone, and she would never have to see him again. Mother did not doubt that Kate was abused considering the incident with Permenter walking around the house naked, then Allie's parents immediately telling her about the abuse.

Mother called police and reported the incident later the same night. That night, the Groves Police Department took initial information from Mother and Kate, then later, a detective contacted them. Mother testified that they gave statements, went to Garth House for an interview, and Kate was examined at the hospital. CPS came and interviewed Mother and the children. Kate later received counseling through Garth House. After this happened, Kate began self-harming, so Mother insisted she go to counseling, although Kate did not want to go.

12

**Testimony of Magan Bonner**

Magan Bonner testified that she is a forensic interviewer at the children's advocacy center, Garth House. Bonner explained that her "job is to provide a safe space for children to come to tell us something that may or may not have happened in a nonleading way using open-ended questions." Bonner described her educational background and training, which included a master's degree in forensic psychology, among other things. She characterized herself as a "neutral party" who was not a part of law enforcement. Bonner explained her typical interview process for children.

In August 2020, Bonner conducted a forensic interview of Kate at Garth House. Bonner testified that Kate was fourteen then and described her as "pretty bubbly and friendly . . . until it was time to discuss the alleged abuse." When Bonner approached the issue of the alleged abuse, Kate's demeanor changed, and "[s]he shut down[.]" Bonner said that children may respond differently when they become uncomfortable with discussing things like this and there is not a typical interview behavior, but children are often reluctant to discuss allegations of sexual abuse. Kate was able to provide details about her abuse, including who committed the abuse. Nevertheless, Bonner felt Kate

13

may have more to say but was unwilling based on her responses and demeanor during the interview.

Bonner outlined the different types of disclosures. Bonner testified that she often sees delayed outcries with children and described why a child may wait to disclose the abuse. Bonner discussed disclosure as a process and the various steps children go through when they disclose abuse. Victims do not always say everything that happened immediately; it could take years, and she has had some children disclose new information even when they testified in trials.

**Testimony of Kate**

Kate testified that she was sixteen during trial. She is involved in sports and church activities. Kate testified she has four dogs at Mother's house and that her dog, Jackson, sleeps in her room every night.

Kate said they moved to the house in Bridge City right before Hurricane Harvey around August 2017, and they moved to the house in Groves right after the TPC plant explosion around Thanksgiving 2019. Kate, Mother, her brother, and cousin lived in house in Bridge City. She testified that she called Permenter by his middle name, "Matt." They moved in with Permenter because he went through a divorce at the same time as her parents.

14

When they first moved into the Bridge City house with Permenter, it was "[c]haotic" and there was "[a] lot of fighting." She did not know why they were not getting along, but it was "a big change for everyone; so, it was stressful." In that house, Kate and her brother each had their own room, and Mother and Permenter shared a bigger room with two beds. She testified that she and Permenter fought a lot initially, but they argued less over time. Permenter began showing favoritism to Kate, and "[h]e had authority over everything in the house." Permenter became more involved in her life over time and would take her places, like practices, where he was alone with Kate. She was initially unconcerned about Permenter's drinking but became concerned later.

Kate testified that Permenter first abused her on his birthday, which was February 17, 2019, which she described as "traumatic" and "scary." At the time, Permenter was thirty-seven or thirty-eight. That night, Permenter came into her room about 2 or 3 a.m. while she was asleep. She felt something when Permenter came into her room and woke up. Kate looked up and saw his face; he was on her bed. She testified that she felt his tongue going inside of her vagina, and his hands were on her knees holding her legs open. After that, Permenter had sex with her the same night by putting his penis inside her

15

vagina. She remembered that he was on top of her, "thrusting," and made "[g]roaning noises." Kate described the experience as "[p]ainful."

She did not say or do anything, but she could smell alcohol on him. Kate said, "He seemed to know exactly where he was at." He left when he was done and said nothing to her. Kate was twelve when it happened. She sat silently while this happened and was scared. After this incident, people touching her knees was something that bothered her. Kate testified that Permenter wore a t-shirt but did not have any pants or underwear on. When it was over, Kate laid there and felt "[g]ross."

Kate decided not to tell anyone. Permenter had become a father figure to her and was someone she thought she could trust. She struggled with understanding that an adult she trusted would hurt her.

Kate saw Permenter the next day; he apologized and told her it would not happen again. It happened again months later, though, while they lived in the Bridge City house. Kate testified that he had sex with her "[a] few times in the Bridge City house[,]" but she could not remember how many times. She estimated he had sex with her less than ten times in the Bridge City house. Sometimes, he went as long as five months without abusing her. Other times, Permenter had sex with her a lot in a short period. Usually, she woke up when

16

he came in and took her clothes off. He also told her, "It's easier when they're asleep[,]" and that "[y]our future man will thank me." At times she tried to kick him or push him off, but when she did, he slapped her, choked her, and held her down. Then, Permenter would have sex with her by putting his penis into her vagina. The times he assaulted her in Bridge City were spread out over the whole time she lived there.

They moved to Groves in 2019. It happened more often in Groves and always occurred in her bedroom. Kate's birthday is in June, and in 2019, she turned thirteen, so there was a period when she lived in Groves that she was thirteen. Much of this was reported right after she turned fourteen. The first time Permenter came into Kate's room at the Groves house, he had sex with her. He took her clothes off like he did at the Bridge City house. The first time he came into her room in the Groves house, his mouth did not touch her private parts; he had sex with her by putting his penis in her vagina. When Permenter came into her room at both homes, he also rubbed her vagina, put his fingers inside her vagina, and touched her breasts.

He had sex with her more often when they lived in Groves, because Permenter drank more then. Kate testified that the time periods between the abuse were shorter in Groves; Permenter never went four or five months

17

without abusing her when they lived in Groves. Kate estimated that Permenter came into her room between twenty and fifty times when they lived in Groves, and sometimes, her dog was there.

Kate testified that her behaviors did not change during this period, but her anxiety increased, and she had nightmares. One of the first people who learned about the nightmares was her friend, Allie. The nightmares involved Kate reliving the sexual abuse by Permenter.

Kate began spending a lot of time at Allie's house during COVID in the spring and summer of 2020. Permenter's abuse of her slowed when she began spending more time at Allie's. Allie pleaded with Kate to let her tell someone. She was a little relieved when her mother learned about it.

Kate did not know what would happen after they reported it and did not know that she would have to undergo a medical exam or go to Garth House for a forensic interview. Kate said that she was not ready to talk about the abuse yet but did not regret disclosing the abuse. Kate gave the forensic interviewer some information but did not tell her everything. She testified that she answered Nurse Thomas's questions truthfully, but she left out details. Kate explained that the incident referenced in Nurse Thomas's report was that Permenter touched her over her clothes. She said there were times he came in

18

and did not take her clothes off, but she noted that she was scared to tell Nurse Thomas everything right after it happened. Kate told the jury how Permenter's abuse impacted her.

**Testimony of John Hudson and Objection to Recorded Interview**

John Hudson testified that he is a sergeant assigned to the Criminal Investigation Division with the Groves Police Department and works as a detective. Hudson primarily handles sex abuse cases. He has been with the Groves Police Department since 2011 and handled "numerous" crimes against young children.

Hudson investigated the case involving Kate and was assigned to it on August 13, 2020. Hudson first contacted Mother to set up Kate's interview at Garth House. He also spoke with Kate briefly about collecting bedsheets as evidence but ultimately decided not to collect them, since he learned the last abuse occurred at least a month before, and Kate washed them frequently because a dog slept with her. Kate was also sent to a forensic nurse examiner for a sexual assault exam. After scheduling Kate's Garth House interview and nurse exam, Hudson spoke with Allie and her mother. Hudson then spoke with Permenter.

Hudson watched Kate's Garth House interview on closed circuit television and explained that although she initially seemed upbeat and talkative, when asked about the abuse, she "almost shut down." Hudson testified that it is "[p]retty common" for there to be a delay between when the last sexual abuse occurred and the outcry. He explained that it was typical for a victim to testify about more acts of sexual abuse than what they disclosed in their forensic interview; children are sometimes willing to disclose more years later than they did during the initial investigation.

Hudson explained that "almost every time" he investigates a case, he asks the person accused to speak with him. Here, Hudson left Permenter a voicemail on a Thursday after Kate's Garth House interview, and Permenter came in for his interview the following Monday. Hudson said that he interviewed Permenter in an interview room at the Groves Police Department. Hudson testified that he assumed Permenter drove himself, nobody from the police department brought him, he was not handcuffed during the interview and was not under arrest. Hudson told Permenter multiple times during the interview that he was free to leave, he was not under arrest or going to be arrested at the end of the interview, and he was free to leave regardless of whether he answered questions. Hudson confirmed that Permenter understood

those admonishments, and Permenter stayed and continued answering questions. He explained that if Permenter had asked to leave and said he did not want to answer questions, Hudson "would have opened the door and escorted him to the lobby." Hudson asked Permenter about Kate's allegations against him and recorded the interview with a body camera. Hudson authenticated State's Exhibit 8 as a true and accurate copy of Permenter's recorded interview.

Permenter objected to State's Exhibit 8 noting, "It's not a statement. It is an interview, I guess back in the old days used to be called an interrogation. Everything the detective said is accurate, but it's full of hearsay and that's our objection." The State responded that "it's an interview with the defendant in this case. Questions are asked by the detective, and the defendant answers. That's not hearsay. That's an exception." The trial court then sent the jury out and after reviewing the video, asked Permenter to restate his objection. The defense stated,

> Judge, my objection is it's hearsay. It's not an interview. It's true the detective – they go back and forth. He's told him several times he won't be arrested today, he's not in custody, he can leave the interview any time he wants. But just the nature of the setting, the conversation is highly suggestive and it's prejudicial and, of course, the detective could tell the jury everything . . . the

21

defendant said, but the playing of the video should be . . . excluded and it also mentions Mr. Permenter's arrest for two DWIs.

Although the defense did not object based on article 38.22, the trial court noted that while this constituted an oral statement, article 38.22 section 3 did not apply since "this is not a custodial interrogation." The trial court explained that Permenter "is not in custody here." The trial court reasoned that Permenter was not under arrest, he was free to leave whether he answered questions or not, and he was allowed to freely leave.

Ultimately, the trial court concluded the "statement was made under voluntary conditions" and that "[a]rticle 38.22 is not required to be followed[.]" The trial court determined the video did not meet the definition of hearsay, and found after reviewing the video that "it is a product of statements made by the defendant voluntarily and not under coercion." The trial court then admitted the recorded interview. Before the video was played for the jury, the trial court also instructed the jury that unless they believed beyond a reasonable doubt the statement was voluntarily made, they shall not consider the statement for any purpose.

Before playing the video for the jury, Hudson explained that the law was different regarding interviews versus interrogations. He testified that if

someone is in custody, he must take extra steps and advise them of their rights before they decide whether they are willing to talk and be interrogated. Hudson stated that Permenter was not in custody and that he came to the police station voluntarily, he was free to leave any time and was not arrested.

The video was then played for the jury. Hudson testified that during the interview, Permenter relied on the fact that he drank heavily and could not remember what happened when he drank, which Hudson found hard to believe. Hudson testified that regarding Kate's allegations, Permenter "said something along the lines of that he would not dispute what she said and that he didn't think that she would lie about that." During this testimony, the trial court again admonished the jury that they were responsible "to judge the credibility and the weight to be given the testimony of the witnesses." Hudson told the jury that "[v]oluntary intoxication is not a defense." He also testified that Permenter's lack of response could indicate an admission.

**Testimony of William Matthew Permenter**

Permenter testified that Kate's mother is his first cousin, and he has known her his whole life. They reconnected around 2017. Mother was living near him in the Port Arthur area at the time, so they started "hanging out[.]" They were both married at the time but ended up going through divorces at the

23

same time and decided to "cohabitate" sometime in 2017 before Hurricane Harvey. Before moving into the Bridge City house, Permenter was living in a hotel. They lived together, because it "made financial sense." He testified that in 2019, he was thirty-seven. When Kate lived with him in Bridge City and Groves, she was twelve and thirteen years old.

Permenter denied all of Kate's allegations about what occurred in Bridge City. He explained that the long pauses in his recorded interview were because he felt "a pretty big bomb" was dropped on him and noted that although he did not deny the allegations on tape, he did not admit them either. Permenter testified that he was in shock and "blindsided." He agreed he talked a lot about drinking in the interview and that he needed to stop. Permenter testified that during the interview when he asked why Kate would lie about something like that, he was trying to understand why she would. Permenter tried to explain some of his comments from the interview. Permenter testified that he thought he might have been called in for an interview because he was walking around the house naked and something like indecent exposure if she saw something. So, he figured whatever punishment came with that, he would take. He did not understand that the purpose of the interview with Hudson was to discuss sexually abusing Kate. Rather, he believed he was talking to the detective about

24

his drinking problem and walking around naked one night. He testified he did not remember walking around naked or Mother confronting him about it that night, but he remembered being told about it and being on the couch without clothes, so he knew it happened. He also remembered going into Kate's room one night when he was drinking and looking for a cell phone.

He denied that his mouth or penis touched her vagina. Permenter likewise denied that he penetrated her. Permenter also denied that in the Groves house he kissed her and touched her private area over her clothes then walked off. He said that he heard some of the information for the first time during trial. Permenter testified that he could have "[i]nadvertently" or "[a]ccidentally" touched Kate's breast or crotch, "but not with the intent to sexually gratify[.]" He testified that he did not remember doing those things, because he did not do them. Later he testified that he did not remember anything happening; although, he said he did not understand the distinction between recalling that things did not happen or things he has now decided did not happen. He does not remember anything happening, and he felt that would be something he would remember. He asserted that Kate's testimony was untrue.

Permenter disputed that Mother kicked him out of the Groves house; instead, he testified that she would come back but Kate was uncomfortable

25

sleeping there because of him. So, Permenter offered to leave temporarily while they figured out what was going on. At the time, he did not know yet what Kate alleged he did, other than that he went into her room at night and did not feel safe, but there was no talk of sex.

After that, he talked to the detective, and CPS called and asked him questions. He did not hear anything else until November 2021, when he was pulled over on a traffic stop and was taken in on a warrant.

**Additional Evidence**

Additional evidence admitted at trial included, among other things: SANE report; photographs; and Permenter's video recorded interview. The video interview showed Permenter entering the police station interview without handcuffs and Hudson repeatedly telling him that he was not under arrest, would not be arrested that day, and was free to leave at any time. The interview also shows that when Hudson informed Permenter of Kate's allegations, Permenter said that he does not dispute them and that she had no reason to lie about something like that. Permenter also repeatedly claims he drinks a lot and "blacks out" where he cannot remember things. During the interview, when Hudson told Permenter about Kate's allegation—that he has been coming into her room and doing sexual stuff to her—Permenter said he was not

going to dispute it. He also said he did not think she would lie about it but claimed he could not remember and that he "would pay the piper."

## ISSUE ONE: ADMISSION OF RECORDED INTERVIEW

In issue one, Permenter complains that the trial court erred by allowing his video statement into evidence in violation of Texas Code of Criminal Procedure article 38.22. Although not entirely clear, he seems to be claiming that he was in custody when the police interviewed him. In support of this issue, he contends that he was not admonished of his rights under *Miranda* and should have been warned of his *Miranda* rights under article 38.22, section 3(a). Regarding custody, he contends the police had already determined probable cause existed to the degree associated with arrest yet told Permenter he was free to go at any time, thus deceiving him. The State counters that Permenter's objection on appeal does not comport with his objection at trial, thus he has failed to preserve his complaint. Alternatively, the State contends that Permenter's statement was noncustodial and voluntary.

**Error Preservation Rules**

Texas Rule of Appellate Procedure 33.1(a) provides that to preserve a complaint for appeal, a party must make a complaint "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R.

27

App. P. 33.1(a)(1)(A); *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (citation omitted). "Likewise, under Rule 103 of the Texas Rules of Evidence, error may not be predicated upon a ruling which admits or excludes evidence unless 'a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.'" *Resendez*, 306 S.W.3d at 312 (quoting Tex. R. Evid. 103(a)(1)).

Requiring a specific objection in the trial court serves two purposes: "to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint." *Id.* (citation omitted). To preserve error, a party must be specific enough to let the trial court know what he wants, why he thinks he is entitled to it, and do so clearly enough that the judge understands him while the trial court is able to do something about it. *Id.* (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). "The parties, not the judge, are responsible for the correct application of evidentiary rules;" thus, to preserve a complaint, "the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention." *Id.* at 313 (citation omitted). Yet we cannot consider only the specific complaint in question, we also look at the context. *Id.* "When the correct ground for exclusion was obvious to the judge and opposing

28

counsel, no forfeiture results from a general or imprecise objection." *Id.* (citations omitted).

**Standard of Review and Applicable Law**

During the trial, Permenter presented an oral motion to suppress his recorded interview. We review a trial court's ruling on a motion to suppress for an abuse of discretion and reverse only if it is outside the zone of reasonable disagreement. *See Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021); *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). "Custody is a mixed question of law and fact that does not turn on credibility and demeanor unless the witness testimony, if believed, would always decide the custody question." *Wexler*, 625 S.W.3d at 167 (citing *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013)). "We apply a bifurcated standard of review, giving almost total deference to the trial court's factual assessment of the circumstances surrounding the questioning and reviewing *de novo* the ultimate legal determination of whether the person was in custody under those circumstances." *Id.* (citation omitted).

Pursuant to *Miranda* and article 38.22 section 3, oral statements produced by custodial interrogation are inadmissible unless the accused is first warned that he has the right to remain silent, his statement may be used against him, and he has the right to hire a lawyer or have one appointed. *Id.*; *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *see also* Tex. Code Crim. Proc. Ann. art. 38.22 §§ 2(a), 3(a). Article

29

38.22 sections 2(a) and 3(a) require an additional warning that the accused has the right to terminate the interview at any time. *See* Tex. Code Crim. Proc. Ann. art. 38.22 §§ 2(a), 3(a)(2); *Wexler*, 625 S.W.3d at 167; *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). "These warnings are required only when there is custodial interrogation." *Wexler*, 625 S.W.3d at 167 (citing *Herrera*, 241 S.W.3d at 526); *see also Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008) (explaining that sections 2 and 3 of article 38.22 only apply to custodial interrogation statements and that only those that are "warned and waived" can be admitted). In addition to the warnings outlined in section 3(a)(2), that section's additional safeguards include, among other things, that: (1) the statement be recorded; (2) the recording has not been altered; and (3) the voices are identified. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 3(a)(1), (3), (4).

In *Dowthitt v. State*, the Court of Criminal Appeals outlines four situations which may constitute custody, including

> 1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

931 S.W.2d 244, 255 (Tex. 1996) (citation omitted); *see also Wexler*, 625 S.W.3d at 168. In the first three situations, the restriction upon freedom of movement must rise

30

to the degree associated with an arrest as opposed to an investigative detention. *See Wexler*, 625 S.W.3d at 168; *Dowthitt*, 931 S.W.2d at 255. For the fourth scenario, "the officer's knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe she is under restraint to a degree associated with an arrest." *See Wexler*, 625 S.W.3d at 168 (citing *Dowthitt*, 931 S.W.2d at 255; *Stansbury v. California*, 511 U.S. 318, 325 (1994)). An officer's subjective intent to arrest the suspect is irrelevant unless the officer communicates or manifests that intent to the suspect. *Stansbury*, 511 U.S. at 324–25; *Wexler*, 625 S.W.3d at 168; *Dowthitt*, 931 S.W.2d at 254. It is the defendant's initial burden to establish the statement was the product of a custodial interrogation. *See Wexler*, 625 S.W.3d at 168.

**Analysis**

We agree with the State that Permenter's only objection in the trial court was based on hearsay, but the trial court made a ruling that broadened the scope of the discussion. The trial court advised the parties that while article 38.22, section 3 applied to the admissibility of custodial oral statements, those "safeguards" did not apply in this case since Permenter's statement was non-custodial and voluntarily given. The trial court does not mention *Miranda* specifically or parse between that warning and the statutory warning required in article 38.22. The trial court also noted

31

that here, the statement was video recorded, and the recording was accurate. We question whether error was preserved here as to the specific complaint Permenter makes about the failure of the officers to give *Miranda* warnings, but we will address the merits of Permenter's complaint considering the trial court's broad reference to the "safeguards" contained in article 38.22, section 3. *See Mayfield v. State*, 828 S.W.2d 568, 571 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (explaining differences between *Miranda* and 38.22's statutory warnings and addressing merits of complaint, despite having "some misgivings about whether error was preserved"); *see also Resendez*, 306 S.W.3d at 312–14 (discussing article 38.22 and distinction between the appellant failing to receive statutory warnings at all as opposed to a failure to memorialize the warnings on tape and concluding error was not preserved).

Permenter contends on appeal that he was in custody because the officers had probable cause to arrest him when they interviewed him. We disagree. Probable cause alone does not mean a suspect is in custody, rather the police must have probable cause to arrest, *and* the officers must fail to tell the suspect he is free to leave. *See Dowthitt*, 931 S.W.2d at 255. In other words, probable cause to arrest alone is not enough; the police must also manifest an intent to arrest the suspect. *See id.*; *see also Stansbury*, 511 U.S. at 324–25; *Wexler*, 625 S.W.3d at 168. Here, the recorded interview shows Hudson walking into the interrogation room followed by Permenter, who is not handcuffed. Hudson repeatedly advises Permenter that he is

32

not under arrest and will not be arrested that day, regardless of what he tells Hudson. Further, at the end of the interview, Hudson allows Permenter to leave and walks him out of the interview room. The record shows that Hudson did not manifest an intent to arrest Permenter and the officers repeatedly told Permenter he was free to leave. *See Stansbury*, 511 U.S. at 324–25; *Wexler*, 625 S.W.3d at 168; *Dowthitt*, 931 S.W.2d at 255. Permenter presented no evidence during the hearing that would contradict the video recording; thus he did not meet his initial burden of establishing this was a custodial interview. *See Wexler*, 625 S.W.3d at 168. Absent a custodial interview, the trial court correctly determined that neither Miranda nor 38.22, section 3(a) warnings were required. We overrule issue one.

## ISSUE TWO: SUFFICIENCY OF THE EVIDENCE

In issue two, Permenter challenges the sufficiency of the evidence to support the jury's verdict.

**Standard of Review and Applicable Law**

In reviewing the legal sufficiency of the evidence, we use the standard set forth in *Jackson v. Virginia*. *See Witcher v. State*, 638 S.W.3d 707, 709 (Tex. 2022) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under that standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Witcher*, 638

33

S.W.3d at 709–10; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We defer to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Witcher*, 638 S.W.3d at 710 (citation omitted); *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *See Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury is the sole judge of the weight of the evidence and the witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the defendant's guilt, if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (citations omitted); *Hooper*, 214 S.W.3d at 13.

As applicable here, under the statute, a person commits the offense of continuous sexual abuse of a child if:

> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time of the commission of each of the acts of sexual abuse the actor is 17 years of age or older and the victim is a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense.

Act of May 26, 2017, 85th Leg., R.S., ch. 1038, § 2, 2017 Tex. Sess. Laws 4079, 4079 (current version at Tex. Penal Code Ann. § 21.02(b)).[3] Section 21.02 of the Penal Code defines "act of sexual abuse" as including, among other things, an act that constitutes the offense of "indecency with a child under Section 21.11(a)(1), if the actor committed the offense in a manner other than by touching, including touching through clothing, the breast of a child[,]" and "aggravated sexual assault under Section 22.021[.]" Tex. Penal Code Ann. § 21.02(c)(2), (4). A person commits the offense of indecency with a child if the person engages in sexual contact with a child younger than 17 years of age or causes the child to engage in sexual contact. *Id.* § 21.11(a)(1). "Sexual contact" generally means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of

---

[3]We have cited to the 2017 version of the statute in effect at the time, but the 2021 statutory amendments do not impact the outcome of this appeal, so for the remainder of the opinion we have cited to the current version of the statute.

the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person. *Id.* § 21.11(c). Except the continuous sexual abuse statute specifically excludes touching the breast. *See id.* § 21.02(c)(2). As relevant here, a person commits the offense of aggravated sexual assault of a child, if he intentionally or knowingly "causes the penetration of the . . . sexual organ of a child by any means." *Id.* § 22.021(a)(1)(B)(i).

The State need not prove the precise dates of the abuse, only that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *Brown v. State*, 381 S.W.3d 565, 574 (Tex. App.—Eastland 2012, no pet.); *Lane v. State*, 357 S.W.3d 770, 773–74 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see also* Tex. Penal Code Ann. § 21.02(d) ("[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed."). The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for indecency with a child. Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (providing that child's testimony alone is sufficient to support a conviction for a sexual offense when the child is under the age of seventeen at the time of the alleged offense); *Chasco v. State*, 568 S.W.3d 254, 258 (Tex. App.—Amarillo 2019, pet. ref'd).

**Analysis**

The indictment alleges that between February 17, 2019, and March 31, 2020, Permenter committed two or more acts of sexual abuse against Kate by: touching her genitals with the intent to arouse or gratify; intentionally or knowingly contacting her sexual organ with his mouth; intentionally or knowingly causing her sexual organ to contact his sexual organ; and by intentionally or knowingly causing his sexual organ to penetrate her sexual organ. Kate testified that the first time he assaulted her in the Bridge City home on February 17, 2019, he put his tongue in her vagina, and that he had sex with her by putting his penis in her vagina a "few times" but less than ten while they lived there. She also said sometimes he went "months" without assaulting her while they lived in Bridge City. Kate also testified that Permenter continued to have sex with her when they moved into the Groves home, estimating this occurred more than twenty but less than fifty times while they lived there. Kate said she was the ages of twelve and thirteen when this occurred. Kate's testimony alone was sufficient to support the verdict. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Chasco*, 568 S.W.3d at 258.

Although Kate testified to more incidents of sexual abuse at trial than she noted in the SANE report narrative, witnesses explained that was not uncommon for children and that disclosure is a process. Permenter contradicted Kate's allegations and denied ever sexually abusing her. The evidence also showed that Mother caught

37

Permenter walking around naked in their home and drunk one night, and he said he could not get in the bed because the dog was in the way; Mother explained this was concerning since Kate was the only one in the home who had a dog sleeping in her room.

The jury, in its role as factfinder, could have found Kate's testimony credible and disbelieved Permenter's. *See Febus*, 542 S.W.3d at 572. The jury also was free to resolve any inconsistencies in the testimony. *See Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. The jury could have believed Kate's testimony that the abuse started in 2019, when they lived in Bridge City, and ended in 2020, when they lived in Groves. Based on the evidence, the jury could conclude that Permenter, "during a period that is 30 or more days in duration, committed two or more acts of sexual abuse." *See* Tex. Penal Code Ann. § 21.02(b), (d); *Lane*, 357 S.W.3d at 774. Viewing the evidence in the light most favorable to the verdict and deferring to the jury's role to determine the witnesses' credibility and weight to give their testimony, we conclude that a reasonable factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Witcher*, 638 S.W.3d at 709–10; *Febus*, 542 S.W.3d at 572; *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Chasco*, 568 S.W.3d at 258; *Lane*, 357 S.W.3d at 774. We overrule issue two.

**CONCLUSION**

Having overruled Permenter's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on January 24, 2025
Opinion Delivered July 9, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.